**Affirmed and Opinion filed August 21, 2014.**



In The

# 𝔉𝔬𝔲𝔯𝔱𝔢𝔢𝔫𝔱𝔥 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

---

### NO. 14-13-00259-CR

---

**JOSE JULIAN SANCHEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 262nd District Court
Harris County, Texas
Trial Court Cause No. 1335606**

---

### O P I N I O N

Appellant Jose Julian Sanchez appeals from his conviction for capital murder. A jury found appellant guilty, and the trial judge sentenced him to imprisonment for life. In four issues, appellant contends the trial court erred in permitting the prosecutor to cross-examine him during the guilt-innocence phase of trial concerning his gang membership. Appellant specifically asserts this line of questioning (1) was not relevant, (2) constituted improper character evidence, (3) was substantially more prejudicial than probative, and (4) tended to confuse the

issues for the jury.  We affirm.

## *Background*

Appellant admitted that he shot and killed the two complainants, Eliazar Valenzuela and Abram Vallejo, on January 29, 2012, at the Sunny Flea Market in Houston, but he claimed that he did so in self-defense because of the complainants' aggressive actions towards appellant and his family.  During his opening statement, defense counsel asserted the evidence would show that the complainants initiated the encounter with appellant while he was at a food stand with his wife and their young child.[1]  Defense counsel further indicated that the flea market was an area with high gang-related activity and that the complainants showed "gang signs" during the encounter.

The State's first witness, a Harris County Sheriff's deputy, testified that when he arrived on the scene, he discovered the two complainants lying on the ground about twenty to thirty feet apart and six spent shell casings in the area.  During cross-examination, the deputy stated that he did not believe appellant provoked the altercation.  Defense counsel also asked the deputy several questions regarding gang activity in the area and whether the complainants had gang-related tattoos.  On re-direct, the deputy testified that there was no evidence to suggest that the shooting was gang-related.

A patron of the flea market testified that on the day in question, she observed appellant and another man arguing and a woman that was with appellant periodically step between the men, apparently to calm them down.  At one point, the patron saw appellant pull a gun and shoot the man with whom he had been

---

[1] There was substantial testimony that appellant and his girlfriend referred to each other respectively as "husband" and "wife" and, in fact, were common-law married.  They have two children together, but only one child, their one-year old daughter, was allegedly with them on the day of the shooting.

arguing. The patron then ran to safety with her son. She later saw a second man lying on the ground moaning. She did not see a child with appellant or the woman who was with appellant. The owner of a bar at the flea market testified that on the day in question, he heard multiple gunshots near his business and saw appellant running away from the scene.

Appellant's wife was also called as a witness in the State's case-in-chief. She testified that on the day in question, she, appellant and their one-year-old daughter were preparing to order at a food stand when she heard "some guys saying some things." When she looked in their direction, she saw two men speaking to appellant. She stated that at first, appellant "was trying to ignore them," but then he turned to look at them and words were exchanged between appellant and the men. While she was attending to her daughter, she heard multiple shots and then saw appellant holding a gun. She first heard one shot and saw a man lying on the ground. She turned back to her daughter, as appellant walked toward the man on the ground, and then heard several more shots. Afterwards, appellant ran in the direction of where their vehicle was parked.

On cross-examination by defense counsel, appellant's wife stated that prior to their arrival at the food stand, she "heard a disturbance" at the flea market, and appellant said "there was a couple of guys that seemed like they were messed up" and suggested they walk away from them. She further emphasized that the other two men started the altercation with appellant, but she did not know what was said between them. She testified the other men were bigger than appellant, and she was scared and felt threatened and worried for her child. She told one of the men to get his friend and leave. She also testified to having told police officers that she believed the encounter was gang related because one of the men was "showing a tattoo," pulling up his sleeve and pointing to the tattoo on his arm.

3

A worker at the food stand near the encounter testified that while appellant and his family were in line for food, two men stood approximately three feet behind appellant, speaking "bad words" to him and "throwing signs," meaning making gang signs, with their hands.[2] At this point, appellant's wife was telling him "no baby, no baby" and grabbing him. Appellant lifted the front of his shirt and the two men stepped back. Appellant then pushed his wife away, pulled out a gun, and shot the first man three times. The other man then held up his hand, walked back, and appeared ready to run, but appellant shot him once.[3] Appellant then went to the first man, who was still alive and asking for help, and shot him at least twice more before walking away. Later that evening, appellant twice drove near the food stand in a truck and gave the witness a "deep look." The witness said that this made her afraid, and she acknowledged she originally told the police that the large crowd of people in front of the food stand had prevented her from seeing what happened.

On direct examination during the defense's case-in-chief, appellant testified that as he and his family were walking to the food stand, he saw two men arguing with another man and pushing him. Appellant told his wife to avoid and walk around them. Once appellant and his wife reached the stand, appellant noticed the two men approaching, and he made eye contact with one of them who then said, "what the heck are you looking at?" Appellant tried to ignore the man but then heard him say it again much closer. Appellant turned and the man kept saying things like "what . . . are you looking at? Hey man, I am talking to you."

---

[2] The witness volunteered the information regarding the gang signs while explaining what she saw on the day in question and was not specifically prompted regarding gang signs by the prosecutor's questions. Defense counsel asked more questions regarding the signs during cross-examination.

[3] An assistant medical examiner testified that this second complainant, Vallejo, was shot twice in the back.

Appellant told the man that he didn't want any problems and that he was there with his family. Both of the men then started "throwing up gang signs" and raising their shirts to show their tattoos. Appellant explained that one of the men had a tattoo on his arm of a Texas map with a star on it and that this was a symbol of the Houstones gang. This man told appellant he wanted to fight, but appellant's wife was getting between them and telling the man to leave and appellant to calm down. Appellant said that he felt scared and threatened for himself and his family. Eventually, the men started to walk away, and appellant told his wife "let's go." But one of the men walked face first into a pole and got mad. The man turned toward appellant, and appellant said loudly, "well, you want to mess with me? . . . [T]hat's kind of stupid." Appellant stated the man then ran towards him, telling his friend, "let's get him." At first, appellant's wife tried to get between them but appellant moved her out of the way, pulled out his gun, and started shooting. After shooting the first man, appellant said that he saw the other man moving toward him, so he shot him, too.

During lengthy cross-examination regarding the shooting and appellant's illegal possession and use of the firearm, the prosecutor asked appellant a significant number of questions related to gang knowledge and membership. It is this line of questioning about which appellant complains on appeal. After the first set of gang-related questions, defense counsel objected and a bench conference occurred in which counsel indicated the prosecutor was about to violate the motion in limine, which prohibited asking about extraneous offenses without first obtaining the court's permission. The prosecutor responded that the defense had "opened the door" to the line of inquiry in its opening statement and "throughout the entire trial." The prosecutor further argued that testimony pertaining to appellant's gang knowledge and association was admissible to rebut the defense's

5

theory that appellant acted in fear of the complainants' gang affiliation and that a false impression had been given to the jury that appellant was "an innocent party . . . independent of any gang activity." Defense counsel argued that the line of inquiry was irrelevant, more prejudicial than probative, and would confuse the issues for the jury. The trial judge decided to permit the questioning and granted defense counsel a "running objection."

In response to the prosecutor's questions, appellant acknowledged that he previously had been a member of the Surenos 13 gang prior to having children but that he was no longer a member. He claimed that he was "a dropout" and that he had walked away. He acknowledged that to get in the gang a person has to be "beaten up" and "do something bad" and to leave the gang a person has to be beaten up. Appellant further revealed that he had tattoos related to the gang "all over [his] body," he had written the number 13 on the bottom of his jail slippers so that "other people won't pick on me," and he had several pictures related to the gang on his apartment walls that he said were drawn by a close friend of his. Appellant denied ever pulling up his shirt during the fatal encounter. On re-direct, appellant said that he felt fear throughout the entire episode, even after firing the first shot. Appellant further stated that the complainants could not have known he was in a gang because he was wearing a hoodie that day that covered his tattoos.

The State called, as a rebuttal witness, an inmate who had met appellant while they were both in jail. The inmate testified that appellant told him he became angry when the complainants said "f--- 13s." Also in rebuttal, a Harris County Sheriff's deputy testified that the number 13 was commonly used by members of the Surenos gang and that if a person used that number and was not a member of the gang, it could cause trouble with actual gang members. The jury found appellant guilty of capital murder, and he was sentenced to a mandatory

6

sentence of life in prison.

## *Governing Law*

We review a trial court's decision regarding the admissibility of evidence using an abuse-of-discretion standard. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). We consider the ruling in light of what was before the trial court at the time the ruling was made and uphold the court's decision if it lies within the "zone of reasonable disagreement." *Billodeau v. State*, 277 S.W.3d 34, 39 (Tex. Crim. App. 2009). A court abuses its discretion when it acts without reference to any guiding rules or principles. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). If the trial court's evidentiary ruling is reasonably supported by the record and correct on any applicable theory of law, we will uphold the decision. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

Relevant evidence is generally admissible. *See* Tex. R. Evid. 402; *Erazo v. State*, 144 S.W.3d 487, 499 (Tex. Crim. App. 2004). Irrelevant evidence is inadmissible. Tex. R. Evid. 402. Rule 401 defines "[r]elevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401.

Even relevant evidence may be excluded under Rule 403, however, if its probative value is substantially outweighed by the danger of unfair prejudice from its admission or by a tendency to confuse the issues or mislead the jury. Tex. R. Evid. 403. It is presumed that relevant evidence is more probative than prejudicial. *Andrade v. State*, 246 S.W.3d 217, 227 (Tex. Crim. App. 2007). The opponent of the evidence, in this case appellant, has the burden of demonstrating that the prejudicial effect of the evidence substantially outweighed its probative value. *See*

*Montgomery v. State*, 810 S.W.2d 372, 377 (Tex. Crim. App. 1990). If the opponent of the evidence lodges an objection based on Rule 403, the trial court must weigh the probative value of the evidence against the potential for unfair prejudice or confusing or misleading the jury. *See Andrade*, 246 S.W.3d at 227; *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). The following criteria inform that determination: (1) the probative value of the evidence; (2) the potential the evidence has to impress the jury in an irrational but nevertheless indelible way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence to prove a fact of consequence. *Andrade*, 246 S.W.3d at 228; *Shuffield*, 189 S.W.3d at 787.

Evidence of a defendant's character is generally inadmissible for proving he or she acted in conformity with that character on a particular occasion. *See* Tex. R. Evid. 404(a). Additionally, "[e]vidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith." *Id*. 404(b); *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). Such evidence, however, may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Tex. R. Evid. 404(b).

**Analysis**

In his first two issues, appellant contends the trial court erred in permitting the State to cross-examine him regarding gang membership because the line of questioning was irrelevant and sought improper character evidence. Texas courts have held numerous times that evidence of a defendant's gang affiliation is relevant under particular circumstances. *See, e.g., Vasquez v. State*, 67 S.W.3d 229, 239-40 (Tex. Crim. App. 2002) (holding evidence of defendant's gang affiliation was relevant and admissible over challenges under Rules 401, 402, 403,

8

and 404 to show motive for gang-related crime); *Smith v. State*, 355 S.W.3d 138, 154 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) ("Gang membership is admissible to show bias, motive, or intent, or to refute a defensive theory."); *Tibbs v. State*, 125 S.W.3d 84, 89 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding evidence of defendant's gang involvement was admissible to rebut defendant's theory that the shooting was in self-defense).

Appellant's defensive theory was that he acted in self-defense and in defense of his family. In making this case, defense counsel repeatedly emphasized the apparent gang membership of the complainants, from counsel's opening statement through examination of numerous witnesses. The prosecutor's cross-examination of appellant related to gang membership was relevant to rebutting this defensive theory and establishing a possible motive for shooting the complainants: gang rivalry. *See Vasquez*, 67 S.W.3d at 239-40; *Tibbs*, 125 S.W.3d at 89. The evidence was not offered simply to demonstrate appellant's character or that he acted in conformity with his character. Accordingly, we overrule appellant's first two issues.

In his third and fourth issues, appellant contends the prosecutor's line of inquiry was improper under Rule 403 because it sought evidence the probative value of which was substantially outweighed by the danger of unfair prejudice from its admission or by its tendency to confuse the issues or mislead the jury. To resolve this challenge, we turn to the factors used in assessing Rule 403 challenges. *See Andrade*, 246 S.W.3d at 228; *Shuffield*, 189 S.W.3d at 787. As discussed above, evidence of appellant's gang membership was relevant for purposes of establishing a possible motive and to rebut appellant's sole defensive theory. Thus, the probative value of the evidence was high, and the State's need for the evidence was great. The jury had repeatedly heard from defense counsel and

9

witnesses (in particular, appellant and his wife) that appellant was afraid of the complainants because of their gang affiliation. The evidence of appellant's own gang affiliation helped rebut appellant's self-defense theory and establish a different motive for the shooting. *See Beltran v. State*, 99 S.W.3d 807, 811 (Tex. App.-Houston [14th Dist.] 2003, pet. ref'd) (finding admission of evidence regarding appellant's gang affiliation was necessary to show motive for the crime).

Next, we examine whether the evidence had a strong potential to impress the jury in an irrational and indelible way such that it would find guilt on grounds different from proof of the charged offense. The gang evidence directly related to the circumstances surrounding the fatal shootings at issue in the trial, and it was used by the State to show appellant's motive and rebut his defensive theory. For these reasons, we conclude that evidence of appellant's gang affiliation did not have a strong potential to impress the jury in such a way that it would irrationally find guilt on an improper basis. *See Vasquez*, 67 S.W.3d at 239–40 (stating evidence of defendant's gang membership was directly relevant to the case because it was used to show motive and therefore did not have a tendency to suggest a decision on an improper basis).

Finally, the time devoted to the topic of appellant's gang affiliation was not great, constituting just one part of the State's cross-examination of appellant and a portion of the testimony from the State's two rebuttal witnesses. The State did not initiate a discussion of the issue with any other witnesses and did not place undo emphasis on the evidence. Considering the State's need for the evidence discussed above, the time used to develop the evidence of gang membership and practices was not so great that it distracted the jury from considering the charged offense. Having evaluated the Rule 403 factors, we conclude the trial court did not abuse its discretion when it admitted the evidence over a Rule 403 objection. *See id*. at 240

10

(holding that any prejudicial effects stemming from admission of evidence of defendant's gang membership did not substantially outweigh the value of showing the motive for the murder); *Beltran*, 99 S.W.3d at 810–11 (holding that evidence of defendant's gang membership did not violate Rule 403 because it was crucial to show motive for the crime). We overrule appellant's third and fourth issues.

We affirm the trial court's judgment.


/s/     Martha Hill Jamison
        Justice


Panel consists of Chief Justice Frost and Justices Jamison and Wise.

Publish — Tex. R. App. P. 47.2(b).