**Affirmed and Memorandum Opinion filed November 13, 2018.**



In The

# Fourteenth Court of Appeals

## NO. 14-17-00392-CR
## NO. 14-17-00393-CR

**DONTE JEROME ALEXANDER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 339th District Court
Harris County, Texas
Trial Court Cause Nos. 1545992 & 1545993**

## M E M O R A N D U M    O P I N I O N

A jury found appellant guilty as charged of the aggravated robbery of Jessica Hurwitz[1] and the aggravated kidnapping of Russell Guajardo.[2] The jury sentenced appellant to confinement for fifty-five years and twenty years, respectively. The

---

[1] Trial court cause number 154992; Appeal Number 14-17-00392-CR.

[2] Trial court cause number 154992; Appeal Number 14-17-00393-CR.

sentences were ordered to run concurrently. Appellant timely filed a notice of appeal in both cases. He raises five issues complaining of the sufficiency of the evidence and the erroneous admission of evidence. We affirm.

## FACTUAL BACKGROUND

Both offenses in this case arose from a plan to rob Oscar Cabrera-Lopez, a drug dealer.[3] The plan was executed by three men. One of the men, Joshua Smith, was known to Guajardo because they were high-school classmates. The other two men were eventually identified as Jeffery Jenkins, also known as "Fifi," and appellant. During the effort to rob Cabrera-Lopez, Hurwitz's keys were taken and Guajardo was held at gunpoint. Guajardo made a pre-trial and in-court identification of appellant. Appellant's defense was misidentification. To prove the identity of appellant as the third man involved in the Cabrera-Lopez robbery, evidence of a subsequent robbery of another drug dealer, Deandre Blacklock, was admitted into evidence. Blacklock was robbed by three men and one of them, Smith, was shot and killed. The challenges on appeal pertain to the theft of Hurwitz's car keys and the admission of text messages from Smith's cell phone, the pre-trial and in-court identification of appellant by Guajardo, and the extraneous offense—the Blacklock robbery. Before considering appellant's complaints, we set forth the evidence relevant to his issues.

## THE EVIDENCE

Guajardo testified that on February 4, 2013, he talked to Smith, a friend in his class at school, about procuring marijuana for Smith. The plan was for Guajardo to take Smith to the "plug," the person with the marijuana. Smith had Guajardo's phone number, which ended in 5582, and they arranged to meet after school. When they

---

[3] The robbery of a drug dealer is commonly called a "drug rip."

met, Guajardo walked up to a vehicle, which he described as a small black SUV. Two males Guajardo did not know were in the front seat of the vehicle. Both men had pistols and one of them ordered Guajardo to get in the vehicle. Smith was in the backseat and did not have a gun. Guajardo entered the vehicle and sat behind the driver's seat. In court, Guajardo identified appellant as one the two men in the front seat of the vehicle.

Guajardo sent the plug, Cabrera-Lopez, a text and they drove to an apartment complex on Woodchase. Once there, Guajardo refused to tell the men where Cabrera-Lopez lived but he called Cabrera-Lopez and told him to come outside. Guajardo testified that Cabrera-Lopez came up to the vehicle that he was in and, after that, all Guajardo saw was Cabrera-Lopez running away. The vehicle then went forward a little bit and stopped. The people in the front seat got out and ran to another car. Guajardo was left alone in the car with Smith. Guajardo tried to open the door but could not and testified that he was locked in the vehicle. Guajardo hit Smith in the face but then the other two men came back; they were gone about two seconds. Guajardo was driven back to a location near where he had been picked up.

According to Guajardo, he cooperated to try and "get out of the situation" but was not part of the plan to rob Cabrera-Lopez. Guajardo testified that the men who tried to rob Cabrera-Lopez threatened to kill him and cut off his ears; stuck a gun "far down" his throat; put a gun to his head; pointed a gun at his chest; said they were going to kill him; and hit him in the head with a gun. Guajardo did not initially call the police because he did not want to "get busted" for selling marijuana. Guajardo called the police about two days later.

Jessica Hurwitz testified that she was at an apartment on Woodchase along with Cabrera-Lopez and two other females, Ashley and Nubia. The four of them left the apartment; Cabrera-Lopez was going to meet Guajardo to sell him marijuana.

3

Hurwitz went to her car with Ashley and Nubia; Hurwitz got in the driver's seat while Ashley and Nubia got in the backseat. Cabrera-Lopez walked in the direction of a vehicle parked behind Hurwitz's car.

Hurwitz testified that Cabrera-Lopez suddenly got in the passenger seat and told her to hurry up and reverse. Hurwitz put the car in reverse but a man was standing next to her and there was a gun in her face. The man opened the door and told Hurwitz that he was a police officer and she was under arrest. When Hurwitz asked, "for what," he would not answer. The man told her to park the car and take the keys out of the ignition. He then reached across her, gun still to her head, and took the keys. The man then ordered Cabrera-Lopez out of the car. Cabrera-Lopez took off and the man ran after him. The man kept Hurwitz's car keys. Hurwitz was unable to identify the man. After Hurwitz got out of her car, she saw the other vehicle was gone. Hurwitz called the police but did not tell the officer about Cabrera-Lopez.

Cabrera-Lopez testified that Guajardo called and asked him for two ounces of marijuana. Cabrera-Lopez put the marijuana in his backpack and left the apartment with Ashley, Nubia and Hurwitz. Cabrera-Lopez approached a vehicle, which he described as a dark green SUV, in the parking lot while the others entered Hurwitz's vehicle. Cabrera-Lopez saw Guajardo in the middle of the back seat with a gun to his head. Two men exited the vehicle — one from the driver's side and one from the passenger's side. The third man remained in the backseat with Guajardo. The men told Cabrera-Lopez that he was under arrest and to get on the ground. Both men had guns and Cabrera-Lopez suspected they were not police. Cabrera-Lopez ran to Hurwitz's car, dropping the backpack as he ran, and entered the vehicle on the passenger's side. Cabrera-Lopez told Hurwitz to put the vehicle in reverse but before she could, a man was next to her door and there was a gun in her face. The man said he was a police officer, to get out of the car, and she was under arrest. The man told

4

Hurwitz to park the car and take the keys out of the ignition. He reached across her, gun still to her head, and took the keys. The other man opened Cabrera-Lopez's car and pointed a gun at him. The men told Cabrera-Lopez to get out and get on the ground. Cabrera-Lopez looked at Hurwitz, she nodded, he got out, put his hands up, and ran. The man on Hurwitz's side of the vehicle ran after Cabrera-Lopez. Cabrera-Lopez continued running and "didn't look back." Cabrera-Lopez called the police and reported seeing "a car with some girls" and "some guys with guns pointed at them." Cabrera-Lopez did not disclose his involvement. When the police called Cabrera-Lopez three or four days after the incident, he denied there had been a drug deal. Cabrera-Lopez testified the two men were wearing hoodies and were African-American with dark complexions but he was unable to make an identification.

Officer Michael Ybanez of the Houston Police Department investigated both the aggravated kidnapping of Guajardo and the aggravated robbery of Hurwitz. Guajardo said he was there to meet Smith and Cabrera-Lopez and admitted the meeting was for a narcotics transaction. Guajardo said two other men were involved. When Ybanez showed a photospread to Guajardo, he tentatively identified appellant. In court, Guajardo positively identified appellant as the person who held him at gunpoint. A suspect for the third man was developed, Jeffery Jenkins, nicknamed Fifi. No other suspects were developed in this case.

Ybanez spoke with Smith and kept his cell phone as possible evidence. Ybanez obtained a search warrant for Smith's phone and was able to review it. Some of the text messages retrieved from Smith's phone were admitted into evidence.

### EXTRANEOUS-OFFENSE EVIDENCE

Approximately seven weeks later, on March 24, 2013, another drug dealer, Deandre Blacklock, was robbed. Blacklock testified that Smith called him wanting to buy a large quantity of marijuana. Blacklock went to meet Smith in the parking

5

lot and saw a small black SUV. When Blacklock approached, he saw three males. The driver, Smith, said to get in the back and Blacklock got in the passenger seat behind the driver. Smith and appellant pulled out a gun. Appellant said to kill Blacklock and Smith agreed and began driving away. When Blacklock saw appellant look away for a second, Blacklock hit him and reached for the gun. They struggled for the gun. Blacklock tried to get out but the door would not open; he concluded the child-safety lock was on. The gun went off in the struggle. Appellant told Smith to stop the car and he did. Blacklock was able to open appellant's door and fell out of the vehicle, directly on the back of his head. When Blacklock was out of the car, he let go of the gun, got up, and ran around the back of the vehicle. Smith began firing at Blacklock, hitting him in the shoulder. Blacklock got away.

Blacklock was shown a photographic lineup after leaving the hospital and identified appellant. In court, Blacklock identified the man in the back seat with him as appellant. Blacklock testified that appellant had gained weight but Blacklock remembered his eyes.

Sergeant Mohamad Khan of the Houston Police Department investigated the Blacklock case. It occurred on Creekbend, within six miles of the robbery and kidnapping on Woodchase. The first suspect developed in the Blacklock case was Smith. Khan spoke with Ybanez, who had developed appellant and Jenkins as suspects in the Woodchase case. Khan identified appellant in court as one of Ybanez's suspects. Khan also was looking for two men in addition to Smith. Khan arranged for Blacklock to be shown a photographic lineup and Blacklock identified appellant.

Khan interviewed appellant about the Creekbend robbery. Appellant said he was not there but was in the back of a vehicle that was fired at in a drive-by shooting. Khan confronted appellant with the fact that a gun went off inside the vehicle and

appellant changed his story to agree that the shot was fired inside the vehicle. Appellant eventually admitted that he was at the scene of the offense on Creekbend. Appellant said another man got in the vehicle with him, a black male that Khan assumed to be Blacklock, but appellant did not know his name. According to appellant, they were engaged in a drug transaction. Appellant identified the driver as "Fifi," whose real name was Jeffery Jenkins. Jenkins told Blacklock to get in the vehicle and Blacklock did, in the seat behind Smith and next to appellant. According to appellant, Blacklock pulled a weapon on appellant, put it to appellant's right side, and attempted to rob appellant, Smith, and Jenkins.

Having set forth the evidence pertinent to appellant's claims, we now determine appellant's complaints on appeal. We address the sufficiency of the evidence before turning to the admission of evidence.

## SUFFICIENCY OF THE EVIDENCE

We initially consider appellant's third issue claiming the evidence is legally insufficient to support his conviction for aggravated robbery because, if sustained, it would afford the greatest relief. *See* Tex. R. App. P. 43.3; *Campbell v. State*, 125 S.W.3d 1, 4 n.1 (Tex. App.–Houston [14th Dist.] 2002, no pet.) (stating reviewing court should first address complaints that would afford the greatest relief). When reviewing the sufficiency of the evidence, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences from it, whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex. Crim. App. 2011); *see also Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The jury is the exclusive judge of the credibility of the witnesses and the weight to be given to the evidence. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Further, we defer to the jury's

7

responsibility to fairly resolve conflicts in testimony, weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id*. This standard applies to both circumstantial and direct evidence. *Id*. We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993).

A person commits robbery if, in the course of committing theft and with the intent to obtain or maintain control of property, he intentionally, knowingly, or recklessly causes bodily injury to another or intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code § 29.02(a). A person commits aggravated robbery if he uses or exhibits a deadly weapon during a robbery. Tex. Penal Code § 29.03(a)(2).

The only element of the offense of aggravated robbery that appellant challenges is that the theft was committed with the intent to obtain or maintain control of property. Appellant argues the State failed to prove appellant, either as a principal or a party,[4] acted with that intent[5] because the evidence shows the intent was to prevent Cabrera-Lopez from leaving, not to steal Hurwitz's property. The jury may infer the requisite intent from a defendant's acts or conduct. *See Guevara v. State,* 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Modarresi v. State,* 488 S.W.3d 455, 463 (Tex. App.—Houston [14th Dist.] 2016, no pet.). The jury heard testimony

---

[4] A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, the person solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Tex. Penal Code § 7.02(a)(2).

[5] A person acts intentionally or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. Tex. Penal Code § 6.03(a). A person acts knowingly, or with knowledge, when he is aware of the nature of his conduct, that the circumstances exist, or that his conduct is reasonably certain to cause the result. Tex. Penal Code § 6.03(b).

that one of the men pointed a gun at Hurwitz and ordered her to put the car in park and take the keys from the ignition. The man then took the keys to Hurwitz's car and kept them. Clearly, the keys were taken to obtain control over them. The reason why, ostensibly to prevent Hurwitz from driving away and thereby stop Cabrera-Lopez from escaping, does not preclude the jury from finding the keys were taken intentionally or knowingly. We overrule appellant's third issue.

## ADMISSION OF EVIDENCE

In his remaining issues, appellant complains of the admission of evidence. We address, in turn, the admission of (1) the text messages from Smith's cell phone; (2) the pre-trial and in-court identification of appellant by Guajardo; and (3) the extraneous offense committed against Blacklock.

### *Text Messages*

Appellant's first issue contends the trial court abused its discretion in admitting into evidence text messages from Smith's cell phone that purported to incriminate appellant in the planning of the offense. Appellant makes two arguments in support of his contention. First, appellant claims the text messages were not authenticated. Second, appellant asserts the text messages were hearsay and not admissible under any exception to the hearsay rule.

Standard of Review

We review a trial court's decision on the admissibility of evidence under an abuse-of-discretion standard and will affirm if the decision is within the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 435 (Tex. Crim. App. 2011). A trial court does not abuse its discretion unless its decision is outside the zone of reasonable disagreement. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). There is no abuse of discretion if the trial court "reasonably believes

that a reasonable juror could find that the evidence has been authenticated or identified." *Druery v. State*, 225 S.W.3d 491, 502 (Tex. Crim. App. 2007).

Authentication

Appellant argues the State failed to authenticate the messages, which were sent by someone listed as "Monke" in Smith's cell phone. Appellant asserts there was no evidence "Monke" is appellant, other than Ybanez's supposition, and no other evidence linked appellant to the messages.

At a hearing held outside the jury's presence, Ybanez testified that Smith did not identify appellant as being involved with this case but said he was with a man named "Gorilla." When Ybanez reviewed the data on Smith's phone, he saw text messages between Smith and other people that Ybanez believed were co-conspirators. The names Ybanez believed were involved were "Monke," "Desmo," and "Big Sis."[6] There were no numbers in Smith's phone for a person known as "Gorilla" but Ybanez believed "Monke" was short for "monkey" and that Smith was lying and trying to mislead him by using "the same monikers." Ybanez stated that when he called appellant "Monke," appellant responded as if that was his name. Ybanez identified appellant in-court as the person he called "Monke." Also, the number appellant gave Ybanez as his cell phone number was 832-881-0993, the same number attributed to "Monke" in Smith's phone.

Appellant contends there was no evidence that "Monke" referred to him and the number listed in Smith's phone was not the same number associated with appellant. Appellant claims the only evidence linking him to the text messages is his own statement that his phone number is 832-881-0993. The first text message admitted into evidence that was sent to "Monke" is from Smith and was sent to 832-

---

[6] Ybanez was unable to determine the identify of "Big Sis" or "Desmo."

881-0903. There was no reply from that number. The next message Smith sent to "Monke" was to 832-881-0993. There was an immediate reply to that message and an exchange of several messages between Smith and "Monke" at the number appellant told Ybanez was his phone number.

Authentication is a condition precedent to admissibility. Tex. R. Evid. 901(a). A proponent of evidence satisfies its burden to establish the authenticity of the evidence if the proponent produces "evidence sufficient to support a finding that the matter in question is what its proponent claims." *Id*. Rule 901(b) provides a list of non-exclusive methods for authenticating evidence, one of which is "testimony of a witness with knowledge" that the item in question is what it is claimed to be. *Id.* 901(b). The trial court's function as gate-keeper is to decide simply whether the proponent has supplied sufficient facts to support a reasonable determination by the jury that the proffered evidence is what the proponent claims. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). In this case, then, the question is whether the State supplied sufficient facts from which a jury could reasonably determine the text messages on Smith's phone to and from the number 832-881-0993 were to and from appellant.

We agree with appellant that more is required to authenticate the text messages than a mere association between the phone number and the purported author and/or recipient of text messages. *See Butler v. State,* 459 S.W.3d 595, 601 (Tex. Crim. App. 2015). Here, however, appellant responded to the same nickname assigned to that phone number in Smith's phone and gave Ybanez that number when asked for his phone number. Also, contrary to appellant's claim that there was no evidence other than Ybanez's theory that appellant was known as "Monke," a friend of appellant's, Kierre Maxwell, testified that "Monke" was appellant's nickname.

Further, the text messages between Smith and "Monke" reflect a robbery was

11

planned for that day, February 4, 2013. Later that same day, Smith exchanged messages with Guajardo, arranging to meet. Guajardo was then held at gunpoint when Smith and two other men, one of whom Guajardo identified as appellant, tried to rob Cabrera-Lopez. Following the robbery, there are text messages on Smith's phone reflecting they did not get any money. The evidence adduced at trial reflects the only property stolen was Hurwitz's car keys.

A proponent must only produce sufficient evidence from which a reasonable fact-finder could properly find genuineness and need not prove beyond any doubt that the evidence is what it purports to be. *Campbell v. State*, 382 S.W.3d 545, 549 (Tex. App.—Austin 2012, no pet.); *see also Cook v. State*, 460 S.W.3d 703, 712 (Tex. App.—Eastland 2015, no pet.); *Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App.—Tyler 2011, pet. ref'd). Maxwell and Ybanez's testimony and the events surrounding the text messages indicate circumstantially that appellant was the author of the text messages from "Monke" and the intended recipient of the text messages from Smith to "Monke." Thus the "peculiar facts" of this case provide a sufficient to support a reasonable determination that the text messages were authentic. *See Tienda*, 358 S.W.3d at 641.

Hearsay

Appellant claims that even if the text messages were authenticated, they are inadmissible because they are hearsay. Appellant asserts there is no exception to the hearsay rule that would allow admission of the messages.

Hearsay is a statement, other than one made by the defendant while testifying at trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). At trial the State argued the statements were admissible because they were made by a co-conspirator to others in the conspiracy and statements by any co-conspirator are admissible at trial of any other co-conspirator. Appellant

12

contends there is no hearsay exception that would support admission of the text messages and again asserts there was no reliable evidence that he was the receiver and sender of the texts. On appeal, the State re-urges its' argument that the text messages were admissible under the co-conspirator rule. Appellant makes no argument to the contrary.

Under rule of evidence 801(e)(2)(E), a statement is not hearsay if it is offered against a party and is a statement made by a co-conspirator "during the course and in furtherance of the conspiracy." Tex. R. Evid. 801(e)(2)(E). Under the co-conspirator rule, a trial court has discretion to determine the admissibility of statements. *Legate v. State*, 52 S.W.3d 797, 803 (Tex. App.—San Antonio 2001, pet. ref'd). Statements are made in furtherance of a conspiracy if they are made (1) with intent to induce another to deal with co-conspirators or in any other way to cooperate with or assist co-conspirators, (2) with intent to induce another to join the conspiracy, (3) in formulating future strategies of concealment to benefit the conspiracy, (4) with intent to induce continued involvement in the conspiracy, or (5) for the purpose of identifying the role of one conspirator to another. *Lee v. State*, 21 S.W.3d 532, 538 (Tex. App.—Tyler 2000, pet. ref'd) (citing *Fairow v. State*, 920 S.W.2d 357, 362 (Tex. App.—Houston [1st Dist.] 1996), *aff'd*, 943 S.W.2d 895 (Tex. Crim. App. 1997)).

The text messages in question were clearly made by co-conspirators with intent to cooperate with or assist in furtherance of their plan to commit robbery. Accordingly, they are not hearsay. *See King v. State*, 189 S.W.3d 347, 359–60 (Tex. App.—Fort Worth 2006, no pet.). We therefore conclude that the trial court did not abuse its discretion by admitting the text messages. Appellant's first issue is overruled.

Appellant's second issue contends the trial court abused its discretion in failing to suppress Guajardo's pre-trial and in-court identification of appellant. Appellant claims the pre-trial identification procedure was unduly suggestive and thereby impermissibly tainted Guajardo's in-court identification. The State first argues the complaint on appeal was not preserved for our review. We agree.

To preserve a complaint for appellate review, a party must present to the trial court a timely request, objection, or motion stating the specific grounds for the ruling desired. Tex. R. App. P. 33.1(a). The appellate complaint must comport with the specific objection made at trial. *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002); *Williams v. State*, 402 S.W.3d 425, 437 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd). An objection stating one legal theory may not be used to support a different legal theory on appeal. *Williams*, 402 S.W.3d at 437; *see also Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995).

In a hearing outside the jury's presence, Ybanez testified that he handed Guajardo a sealed manila envelope that had been prepared by another officer and he was unaware of the location of the suspect in the photospread. "After a short time, complainant, Guajardo, stated he chose the person in the No. 3 position." Guajardo also told Ybanez that it "might be the guy." Ybanez explained to Guajardo that his choices were "negative, positive, or tentative" and that with respect to tentative, "there is a strong tentative and weak tentative." According to Ybanez, those are the guidelines "in HPD Robbery Division files." Written on the photospread are the phrases "strong tentative" and "maybe the man with the gun."

Ybanez testified that when he handed Guajardo the photospread he did not see who was in position No. 3, he did not suggest to Guajardo that the person who may have been involved was in position No. 3, and he did not point to position No. 3.

According to Ybanez, it was only after Guajardo made the identification that Ybanez saw it was appellant.

When Guajardo testified in front of the jury, he stated that it was his handwriting on the photospread. Guajardo identified appellant, without objection, as the person who held him at gunpoint.

Appellant's written motion to suppress claimed the pre-trial identification procedure was impermissibly suggestive. On appeal, appellant argues that Ybanez's explanations that Guajardo's choices were "negative, positive, or tentative" and that "there is a strong tentative and weak tentative" rendered the pre-trial identification procedure unduly suggestive. Appellant's brief claims that after Guajardo indicated appellant may be one of the men in the photo array, his identification became a "strong tentative" following "coaching" from Ybanez. Appellant contends "Ybanez' actions clearly conveyed to [Guajardo] that the person they were looking for was portrayed in the array."

There is no evidence that Ybanez coached Guajardo to identify appellant or even indicated that the suspect was one of the people in the array. At trial, defense counsel agreed Ybanez used a blind procedure. In fact, defense counsel stated "there is no objection to the fact that Russell Guajardo chose the person in Position No. 3." It was the explanation to Guajardo and the inclusion of the phrase "strong tentative" on the array that counsel complained of at trial. Defense counsel even agreed to leave the word "tentative" on the array if "strong" was redacted. The State agreed to redact the entire phrase, "strong tentative," but not just "strong." The trial court agreed with the State that both words should be redacted or there should be no redaction at all. Defense counsel stated his objection "was allowing the jury to hear it was strong tentative."

15

Accordingly, the only complaint preserved for appeal was whether the trial court erred in admitting the photospread without redacting the phrase "strong tentative." That is not the argument presented on appeal. The failure of appellant's complaint on appeal to comport with his objection at trial presents nothing for our review. *See Segovia v. State*, 543 S.W.3d 497, 504 (Tex. App.—Houston [14th Dist.] 2018, no pet.); Tex. R. App. P. 33.1(a). Appellant's second issue is overruled.

*Extraneous Offense*

In his fourth issue appellant asserts the trial court abused its discretion by admitting into evidence an extraneous offense, the aggravated robbery of Blacklock, because it did not have the similarity to the charged offense required to rebut a defense of mistaken identity. *See* Tex. R. Evid. 404(b). Appellant's fifth issue claims the trial court abused its discretion in finding the probative value of the extraneous offense was not substantially outweighed by its' prejudicial effect. *See* Tex. R. Evid. 403.

Standard of Review

We review a trial court's ruling under the Rules of Evidence for an abuse of discretion. *Billodeau v. State,* 277 S.W.3d 34, 39 (Tex. Crim. App. 2009) (citing *Sauceda v. State*, 129 S.W.3d 116, 120 (Tex. Crim. App. 2004)). "We consider the ruling in light of what was before the trial court at the time the ruling was made and uphold the trial court's judgment if it lies within the zone of reasonable disagreement." *Id.* (citing *Rodgers v. State,* 205 S.W.3d 525, 529 (Tex. Crim. App. 2006)); *see also Weatherred v. State,* 15 S.W.3d 540, 542 (Tex. Crim. App. 2000).[7]

---

[7] We reject appellant's suggestion that we review *de novo* the trial court's ruling in accordance with our opinion in *State v. Stukes*, 490 S.W.3d 571, 574 (Tex. App.—Houston [14th Dist.] 2016, no pet.), which concerned a motion to quash. In addition to our reasoning in *Stukes,* we cited *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004), wherein the Texas Court of Criminal Appeals expressly held, pursuant to *Guzman v. State*, 955 S.W.2d 85 (Tex. Crim. App.

Applicable Law

Texas Rule of Evidence 404(b) provides evidence of a crime, wrong, or other act is not admissible to prove a person's character to show that on a particular occasion the person acted in accordance with the character. Tex. R. Evid. 404(b)(1). However, such evidence may be admissible for other purposes, such as proving identity. Tex. R. Evid. 404(b)(2).

Texas Rule of Evidence 403 provides that even relevant evidence may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence Tex. R. Evid. 403. Evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without that evidence. Tex. R. Evid. 401.

It is a question for the trial court whether extraneous-offense evidence has relevance apart from character conformity. *Page v. State*, 213 S.W.3d 332, 335–36 (Tex. Crim. App. 2006) (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "Merely raising the issue of identity does not automatically render the

---

1997), the standard of review on a motion to quash is *de novo*. *See Moff*, 154 S.W.3d at 601. In *Sauceda*, 129 S.W.3d at 120, decided the same year as *Moff*, the Texas Court of Criminal Appeals cited their post-*Guzman* opinion in *Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App.1998), and reiterated the standard of review for a trial court's ruling under the Rules of Evidence is abuse of discretion. Since *Sauceda,* the Texas Court of Criminal Appeals has continued to review a trial court's evidentiary rulings for an abuse of discretion. *See Sanchez v. State*, 444 S.W.3d 215, 220 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (citing *Tillman v. State,* 354 S.W.3d 425, 435 (Tex. Crim. App. 2011)).

extraneous evidence admissible." *Id*. at 336. For evidence of an extraneous offense to be admissible for the purpose of establishing identity, an extraneous offense must be so similar to the charged offense as to mark the offenses as the defendant's handiwork. *Johnson v. State*, 68 S.W.3d 644, 650–51 (Tex. Crim. App. 2002); *see also Ransom v. State*, 503 S.W.2d 810, 812 (Tex. Crim. App. 1974) (holding that to be admissible to prove identity, there must be some distinguishing characteristic common to the extraneous offense and the charged offense). In determining similarity of the offenses to prove identity, we consider both the specific characteristics of the various offenses and the time interval between them. *Johnson*, 68 S.W.3d at 651; *see also Ford v. State*, 484 S.W.2d 727, 729 (Tex. Crim. App. 1972) ("A common distinguishing characteristic may be the proximity in time and place or the common mode of the commission of the offense."). The common characteristics of the two offenses must be so unusual and distinctive as to be like a "signature." *Taylor v. State*, 920 S.W.2d 319, 322 (Tex. Crim. App. 1996). This requires much more than the mere repeated commission of crimes of the same class, such as repeated burglaries or thefts. *Collazo v. State*, 623 S.W.2d 647, 648 (Tex. Crim. App. 1981). If there is no sufficiently distinctive characteristic, then the relevancy of the evidence cannot outweigh its prejudicial potential. *Id.* Each case inevitably will turn on its unique facts. *Id*.

It is presumed that relevant evidence is more probative than prejudicial. *Andrade v. State*, 246 S.W.3d 217, 227 (Tex. App.—Houston [14th Dist.] 2007). The opponent of the evidence has the burden of demonstrating that the prejudicial effect of the evidence substantially outweighed its probative value. *See Montgomery v. State*, 810 S.W.2d 372, 377 (Tex. Crim. App. 1990). If the opponent objects under Rule 403, the trial court must weigh the probative value of the evidence against the potential for unfair prejudice or confusing or misleading the jury. *See Andrade*, 246

S.W.3d at 227; *see also Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). The following factors are considered relevant to the analysis under Rule 403: (1) the strength of the evidence in making a fact more or less probable; (2) the potential of the extraneous-offense evidence to impress the jury in some irrational but indelible way; (3) the amount of time the proponent needed to develop the evidence; and (4) the strength of the proponent's need for the evidence to prove a fact of consequence. *Grant v. State*, 475 S.W.3d 409, 420–21 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd). The trial court is not required to perform the balancing test on the record, and when the record is silent, we must presume that the trial court performed the appropriate balancing test. *Kappel v. State*, 402 S.W.3d 490, 494 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Williams v. State*, 958 S.W.2d 186, 195–96 (Tex. Crim. App. 1997)).

The Extraneous-Offense Evidence

In a hearing outside the jury's presence, the trial court heard testimony regarding the similarity of the Blacklock robbery and the incident in this case. Blacklock received a call from "Josh," whom he did not know. Josh said that he and his sister wanted a large amount of marijuana. Blacklock did not have it but knew someone who did and was planning to charge Josh for the information. Blacklock was waiting for Josh and his sister at the Creekbend apartments. Blacklock was on the phone with Josh when he, Blacklock, walked outside to meet them but "that's not who was outside." Josh directed Blacklock to a small black SUV that was already parked at the apartment complex. Blacklock saw the driver and was about to get in when he saw that "it was three guys instead of a guy and a girl." Josh was sitting in the front passenger's seat. Blacklock got in the backseat, behind the driver. At this time, Blacklock was on the phone with the person who had the marijuana. When Blacklock disconnected the call, the other two males—not Josh—pulled out guns.

Blacklock identified appellant as the person sitting in the backseat next to him who had a gun. Appellant said, "you know what this is . . . I want everything." Blacklock gave Josh his wallet, phone and money. When Josh opened Blacklock's wallet, he found several credit cards and suggested they empty Blacklock's bank account. Appellant then said, "He ain't got no money. Let's just kill [him]." Josh agreed and they switched guns. Josh had a .45, which he gave to appellant, and took appellant's smaller gun. Blacklock tried to open the door but the child-safety lock was on. The driver began to drive off and when appellant looked away for a second, Blacklock hit him and tried to get the gun. The gun went off, hitting Josh. After the car stopped, Blacklock was able to get out through appellant's door.

Khan testified that he was investigating the homicide of Smith on March 24, 2013. At the time of his death, Smith was actively robbing Blacklock at 7600 Creekbend, a location that is five to six miles from the Woodchase apartments. The other two suspects identified as robbing Blacklock were appellant and Jenkins. Khan identified appellant in court. Khan testified that when he interviewed Blacklock, there was nothing peculiar about the case that led him to believe it was connected to the Woodchase robbery six weeks earlier. Khan agreed that "drug rips" are common enough in Houston that "just because it's a drug rip" would not mean they are connected. Khan stated that he would have to look at the details of the cases to determine if it is "their MO."

Analysis

The record reflects the extraneous offense and the charged offenses had the following similarities:

1. Smith arranged a drug transaction;
2. Smith had two other men working with him;
3. Smith and his two accomplices arrived at the location first;

20

4. The vehicle was a small dark-colored SUV;

5. Two of the three men had guns;

6. The person Smith dealt directly with—Blacklock and Guajardo—was directed into the backseat and held at gunpoint;

7. One of the men with Smith threatened to kill Blacklock and Guajardo; and

8. The backdoor of the SUV was locked and would not open from the inside, as if the child-safety lock was on.

Although there were some differences, such as the two men apart from Smith claiming to be police, Texas law does not require extraneous-offense evidence to be completely identical to the charged offense to be admissible to prove identity. *Page*, 213 S.W.3d at 337–38. Here, a comparison of the charged offense and the extraneous offense shows at least eight similarities. These likenesses between the charged offenses and the extraneous offense show a pattern of conduct sufficiently distinctive to constitute a "signature," and thereby qualify as an exception to the general rule precluding the admission of extraneous-offense evidence.

Turning to whether the evidence was more prejudicial than probative, the first factor weighs strongly in favor of admissibility because the evidence was relevant to prove identity and rebut appellant's defensive theory that he was not a party to either of the charged offenses. *See Bargas v. State*, 252 S.W.3d 876, 893 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (determining first factor weighs strongly in favor of admissibility where extraneous-offense evidence rebutted defensive theory). The second and third factors also weigh in favor of admissibility. The extraneous offenses were no more inflammatory than the crimes for which appellant was indicted, so the testimony was not likely to create such prejudice in the minds of the jury that it would have been unable to limit its consideration of the evidence to its proper purpose. *See Taylor v. State*, 920 S.W.2d 319, 323 (Tex. Crim. App. 1996). Any danger the testimony may have impressed the jury in a prejudicial way

21

is overshadowed by its probative value. *See Bargas*, 252 S.W.3d at 893 (viewing prejudicial tendencies of extraneous-offense testimony in sexual assault case as outweighed by its probative value when it was used to rebut a defensive issue). Furthermore, the complained-of testimony was adduced from two of the State's eight witnesses in the course of the four-day guilt-innocence proceedings. Thus, the amount of time spent developing the testimony about the extraneous offense was not lengthy. *See id.* The State's need for this testimony was also significant, favoring admissibility under the fourth factor. *See id*. As noted above, this evidence discredits appellant's theory that he was not party to the robbery of Hurwitz or the kidnapping of Guajardo.

We conclude the extraneous-offense evidence was sufficiently similar to the charged offense to be probative in proving appellant's identity. Considering the above factors, the trial court was within its' discretion in determining that the danger of unfair prejudice did not substantially outweigh the probative value of the evidence. *See Kappel*, 402 S.W.3d at 495 (citing *Tienda,* 358 S.W.3d at 638). Because the trial court's decision to admit the extraneous-offense evidence is within the zone of reasonable disagreement, we determine the trial court's ruling does not constitute an abuse of discretion. Appellant's fourth and fifth issues are overruled.

## CONCLUSION

Having overruled all of appellant's issues, we affirm the judgment of the trial court in each case.

/s/     John Donovan
        Justice


Panel consists of Justices Boyce, Donovan and Wise.
Do Not Publish — Tex. R. App. P. 47.2(b).

22